Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 798 | **DATE** | 3/31/2003 |
| **CASE TITLE** | Vineyard Christian Fellowship of Evanston, Inc. vs. City of Evanston | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due _____. Reply to answer brief due _____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ■  Status hearing set for 4/16/2003 at 9:00 A.M..

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]  Enter Memorandum Opinion And Order.

(11)  ■  [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

| ETV | courtroom deputy's initials |
|---|---|

number of notices

MAR 3 1 2003
date docketed

docketing deputy initials

3/31/2003
date mailed notice

ETV
mailing deputy initials

**Document Number**

92

Date/time received in central Clerk's Office

**DOCKETED**

MAR 3 1 2003

| | |
|---|---|
| VINEYARD CHRISTIAN FELLOWSHIP OF EVANSTON, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 00 C 798 |
| CITY OF EVANSTON, a municipal corporation, | ) ) Judge Rebecca R. Pallmeyer ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Few principles are more venerable or more passionately held in American society than those of local control over land use and the right to assemble and worship where one chooses. On occasion, these principles conflict, and the right to assemble in a location of choice must be balanced against the need of a city to continue to grow economically, to provide adequate municipal services to its residents, and to continue to attract businesses and consumers.

Plaintiff Vineyard Christian Fellowship of Evanston, Illinois ("Vineyard"), an incorporated church, owns property within Defendant Evanston's ("Evanston" or "City") city limits but is barred by the City's zoning ordinance from using the property for worship or prayer. Vineyard has brought a twelve-count complaint under 42 U.S.C. § 1983, alleging that Evanston's zoning laws on their face and as applied against Vineyard violate Sections 15 and 20 of the Illinois Religious Freedom Restoration Act ("IRFRA"), 775 ILCS 35/15 and 775 ILCS 35/20 (Count I); the Equal Protection Clause (Count II), Free Exercise Clause (Count III), First Amendment rights of free assembly (Count IV) and freedom of speech (Count V) of the United States Constitution; the rights of religious freedom (Count VI), freedom of speech (Count VII), freedom of assembly (Count VIII), and equal protection (Count IX) of the Illinois Constitution; Illinois zoning standards (Counts X and XI), and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C.

92

§ 2000cc, *et seq.* (Count XII). Vineyard seeks a declaratory judgment as well as injunctive and other relief.

After this action was removed to federal court, the court heard evidence at a bench trial between January and March 2001. The following constitute the court's findings of fact and conclusions of law pursuant to FED. R. CIV. P. Rule 52. For the reasons set forth below, the court enters judgment in favor of Vineyard with respect to Counts II, IV, V, VII, VIII, and IX. As to the remaining counts, the court enters judgment in favor of Evanston. Finally, the court notes that, as the following discussion demonstrates, it might well be a simple matter for the City to amend its zoning ordinance in such a way as to satisfy the equal protection and free speech concerns at issue in this case.

## FINDINGS OF FACT

### A. Procedural History

Vineyard commenced this action against Evanston in the Circuit Court of Cook County, Illinois on January 12, 2000. Defendant then removed the case to federal court on February 9, 2000. Vineyard filed an amended complaint for declaratory judgment, injunctive and other relief on October 11, 2000. The United States has intervened, arguing on behalf of the RLUIPA's constitutionality, but not taking a position as to whether Vineyard's rights have been violated. The court heard arguments on Vineyard's motion for a preliminary injunction in December 2000 and directed Evanston to permit Vineyard to hold worship services on its property on Christmas Eve and New Year's Eve in 2000. *Vineyard Christian Fellowship v. City of Evanston*, N.D. Ill., No. 00 C 798 (Dec. 12, 2000). A bench trial was held in early 2001. Except with regard to damages, the matter has been fully briefed by the parties. This opinion follows.

### B. The Parties

Plaintiff Vineyard has worshiped in various Evanston locations for approximately twenty-five

2

years. (Transcript ("Tr.") 283.) Its congregation is a member of the worldwide Association of Vineyard Churches (Tr. 66), and it is undisputed that the religious beliefs of Vineyard's members are sincere.

Vineyard's total average weekly attendance in 2000 was approximately 623 (of whom 503 were adults), down from approximately 660 in 1999, and 745 in 1997. (Tr. 266-67.) The church's Sunday morning worship service is one of the largest congregational gatherings in Evanston. (Tr. 83.) More than three-quarters of the church's membership live within five miles of the City, with one-third of its members residing in Evanston, making Evanston the center of the radius within which Vineyard's members live. (Tr. 282-83.)

Evanston is a municipal corporation and is a home rule unit of local government under Illinois law. (Answer to Complaint ("Ans.") ¶ 4.) The City is bounded on the east by Lake Michigan, on the north by the Village of Wilmette, on the west by the Village of Skokie, and on the south by the City of Chicago, and has a total area of approximately 8.5 square miles. (Tr. 929, 1141.) The City thus has no room for geographical expansion and has been almost completely developed for some time. (Tr. 518.)

## C.    The Ordinance

On April 26, 1993, the City adopted the Evanston Zoning Ordinance ("the Ordinance"), Ordinance No. 43-0-93. (City of Evanston Zoning Ordinance, Joint Exhibit 1; Ans. ¶ 8.) The Ordinance has been subsequently amended. (Ans. ¶ 8.) The Ordinance is designed to enforce the City's Comprehensive General Plan ("General Plan"), which is a document articulating the City's values and objectives for land use, public transportation, the location of schools, and other urban planning matters. (Tr. 933; Evanston Comprehensive General Plan of 1986, Plaintiff's Exhibit ("PX") 46; Evanston Comprehensive General Plan of 2000, PX 47.) The City Council adopted new general plans in 1986 and 2000. (Id.) The Ordinance divides the City into 30 base zoning districts

3

and 4 "overlay" districts.[1] (Ordinance § 6-7-1.) The districts include the O1 Office District in which the subject property has been located at all relevant times, residential districts, business districts, commercial districts, downtown districts, as well as several special purpose districts. (*Id.*) Other than the property owned by Vineyard, there are no churches located in any of the City's four O1 Districts. (Tr. 953.)

As described in the Ordinance, O1 Office Districts are intended to provide appropriate locations for "contemporary, moderately low rise office developments" with particular attention to medical offices and financial office centers. (Ordinance § 6-15-2-1.) Permitted uses, which are allowed as a matter of right in O1 Districts, include cultural facilities, financial institutions, government institutions, hotels, offices, public utilities, and restaurants. (*Id.* at § 6-15-2-2.) Special uses in O1 Districts, which must be individually approved by the City Council, include child care centers, commercial indoor recreation facilities, commercial parking garages, commercial parking lots, drive-through facilities (accessory only),[2] membership organizations, multiple family dwellings, retail goods establishments, retail services establishments, and planned developments. (*Id.* at § 6-15-2-3.)

Vineyard asks the court to give careful attention to the correspondences between its proposed use of the property and the definitions of at least one of these permitted uses and one of the special uses which may be allowed in the O1 District. First, "cultural facility" is defined by the Ordinance as "an indoor theater, auditorium, or other building or structure designed, intended

---

[1]    The Ordinance defines an "overlay district" as a "second set of regulations applied to any part or all of a zoning district or any number of districts. The overlay district regulations may relax or further restrict the number or types of uses allowed as well as the way permitted activities operate within the overlay district boundaries." (*Id.* at § 6-18-3.)

[2]    The Ordinance provides that a "drive-through facility" shall only be permitted in connection with a listed permitted or special use (*Id.* at § 6-18-3), and defines an "accessory use" in part as a use that "is subordinate in area, extent, and purpose to the principal structure or principal use served." The court therefore infers that the O1 District would not allow a drive-through facility that was the principal structure or use on a given property.

or used primarily for musical, dance, dramatic or other performances or a library, museum or gallery operated primarily for the display, rather than the sale, of works of art." (*Id.* at § 6-18-3.) Second, the Ordinance defines "membership organization" as "[l]ands, buildings or portions thereof, or premises owned or operated by an organization of a professional, business, trade, civic, social, fraternal, political, or religious nature operating on a membership basis and engaged in promoting the interest of their members." (*Id.* at § 6-18-3.)

The Ordinance defines a "religious institution" as "a church, synagogue, temple, meetinghouse, mosque or other place of religious worship, including any accessory use or structure, such as a school, daycare center or dwelling." (*Id.* at § 6-18-3.) Under this definition, religious institutions are a permitted use in eight of the city's base zoning districts and are designated as special uses in fourteen other districts, but are forbidden in O1 Districts. (*Id.*) Specifically, religious institutions are permitted as of right in three of the City's business districts, three commercial districts (including one mixed-use commercial district), the downtown "fringe" district, a manufacturing district, and the "university lakefront campus district." (*See generally* Zoning Ordinance.) Religious institutions are permitted as special uses in several residential districts as well as three downtown districts, a manufacturing district, an industrial district, and three campus-related districts. (*Id.*)

Approximately 90 religious institutions are currently located in the City (Tr. 1141), and an estimated 90% of the City's geographic area lies in zoning districts in which churches are either permitted or special uses. (Tr. 399, 1140; Graphic of City of Evanston, Defendant's Exhibit ("DX") 5.) Churches are permitted as of right in only 10% of this area; in the other 90%, they are special uses requiring permission from the City Council on a case-by-case basis. (Tr. 411; Permissibility of Religious Institutions within the City of Evanston graphic, PX 45.)

5

**D.  Vineyard's Search for Property**

Any new large congregation or worshiping community would have difficulty finding space in Evanston unless it were able to buy property from a dying congregation within the City. (Tr. 601). Vineyard has made a significant effort to find alternate properties, and in 1997 purchased the subject property, located in an O1 District, despite its knowledge that the use Vineyard intended for the property was not permitted under the Ordinance. (Tr. 148-50, Ans. ¶¶ 7, 11.) It had sought its own property since 1985, and during the process made written offers for nine different locations, as well as more than one offer for certain locations. (Tr. 92, 285.) Vineyard hired a professional real estate broker to assist its search from 1992 to 1996, and its minister, Mr. William Hanawalt, visited at least 59 properties during this period. (Tr. 300-01, 89-90, Vineyard Real Estate Search Table, PX 12.) The church considered properties between Lake Michigan to the east, Wilmette to the north, the Edens Expressway to the west, and the Rogers Park neighborhood to the south. (Tr. 621-22, 681-82.)

Among the properties Vineyard considered were churches that have been closed, former schools, former theaters, commercial property, and an empty lot. (Tr. 214-16, PX 12.) In several instances, landowners refused to sell or rent to Vineyard because they did not want non-retail uses mixed with retail uses on their property. (Tr. 217.) Thus, when Vineyard approached the Dempster Street Plaza and the Main Street Plaza for either rental space or purchasing a subdivision, the landowners in question declined to negotiate on the ground that covenants with existing tenants precluded the transactions. (Id.)

The church also asked Mr. Eric Eriksson, a practicing architect from its congregation, to assist its search. (Tr. 621.) Beginning in 1985 on a volunteer basis, and continuing on from 1988 or 1989 on a paid basis, Mr. Eriksson considered approximately 80 properties, and visited at least 60 in the course of this search. (Tr. 621, 623.) Vineyard has continued to seek alternate sites after

purchasing the subject property and has also considered at least four other sites during the pendency of this lawsuit. (Tr. 214, 257-58; Supplemental Affidavit of Vineyard Pastor William C. Hanawalt of 4/17/02 ("Hanawalt Supp. Aff.") ¶ 4.)

On February 11, 1992, more than a year before the passage of the Ordinance, Vineyard pastor William Hanawalt sent a letter asking the chairman and members of the City's Planning and Development Committee to consider allowing churches in city areas zoned for manufacturing. (Letter of 2/11/92 from Vineyard Executive Pastor Hanawalt to City Planning and Development Committee, DX 6.) The letter indicated that Vineyard was only able to find suitable real estate for its purposes in warehouse-type buildings located in manufacturing zones. (Id.) In this letter, Mr. Hanawalt conceded that it would be "very undesirable for a large church to displace sales tax generating business/commercial property with our required parking and buildings and have a giant 'hole' in a retail area that is relatively empty six days a week." (Id.) The court understands that the letter pre-dates Vineyard's interest in and purchase of the subject property, and the record does not reveal how the subject property was zoned before the ordinance was passed. Vineyard made a series of offers to purchase industrial or manufacturing real estate, but for various reasons the deals fell through. (Tr. 89-101.) There is no evidence in the record that the City responded directly to Mr. Hanawalt's letter, but the City partially complied with Vineyard's request by amending the draft Ordinance to make some of the manufacturing zones places where churches may operate as special uses. (Tr. 293.)

E.    **The Property**

The property ("the subject property" or "1800 Ridge") at issue in this case is located at 1800 Ridge Avenue in Evanston. The property's lot is approximately 200 feet deep with approximately 175 feet of frontage along the west side of Ridge Avenue opposite the intersection of Clark Street. (Tr. 754; Evanston Ridge-Vineyard Subdivision, PX 16.) At an unspecified date in the 1920s, the

7

property was used by a Methodist church.[3] (Tr. 634-636.) The property is now improved with a two-story building, which is approximately 70 years old and has a square footage of between 35,000 and 39,000 feet.[4] (Tr. 754.) The building was originally built to house an auto dealership before being converted into office use by the American Hospital Supply Company in the 1970s. (Tr. 1055). After American Hospital Supply left Evanston in the mid-to-late 1980s, the building was used intermittently for office purposes, and then in 1996 its owner (presumably American Hospital Supply) went into bankruptcy before selling the property to Mark Realty in 1996 (Tr. 536-37).

Vineyard considered purchasing the subject property on several occasions. (Tr. 100, 102.) Because the building is not large enough to accommodate all of Vineyard's members at a single worship service, when the church first considered the property at an unspecified date in the early 1990s, members still hoped they would one day find a larger site.[5] (Tr. 100.) Mr. Hanawalt was familiar with the building from the outside, and finally visited the inside of the property in 1996. (Tr. 102-03.) He was aware that the building was empty intermittently throughout the early 1990's. (Tr. 103.)

On August 23, 1996, Vineyard signed a contract ("the Contract") to buy the subject property from Mark Realty for $1,100,000. (Real Estate Sale Contract of 8/23/96, PX 13.) The Contract contained a zoning contingency that allowed Vineyard to extend the closing date until January 15, 1997 to "obtain all zoning, subdivision and other approvals and/or permits necessary and reasonably acceptable to [Vineyard] for [Vineyard's] use of the Property as a church." (*Id.* ¶ R-6.)

---

[3]     The court presumes the Methodist church's building was torn down some time prior to the construction of the current building.

[4]     The parties agreed in their pleadings that the building at 1800 Ridge is approximately 39,000 square feet in area (Complaint ¶ 31; Answer ¶ 31), but the subsequent testimony before the court estimated the building's size at 35,000 square feet. (Tr. 1055.) This smaller figure might be a reference to the inside, usable space.

[5]     It is unclear whether Vineyard first considered purchasing the subject property before or after the City adopted the Ordinance in 1993.

The Contract also provided that if Vineyard were unable to obtain zoning approval by the required date, it could either terminate the contract and forfeit its $20,000 earnest money or avail itself of successive "zoning extensions," moving the closing until February 15, March 15, and April 15, 1997 at the cost of $10,000, $15,000 and $20,000, respectively. (Id.) In April 1997, Vineyard amended the contract by initially waiving the zoning contingency, and subsequently negotiating an additional extension for the closing date, and agreeing to a per diem payment to Mark Realty until the closing took place. (Tr. 148-49; Letter from Seller's Counsel Marjorie C. Howard to Vineyard Counsel Mark Robert Sargis of 4/30/1997 ("Howard Letter"), PX 14.) Mark Realty conveyed the deed to Vineyard on May 8, 1997. (Ans. ¶ 7; Howard Letter; Special Warranty Deed of 5/8/97, PX 17.)

The subject property was appraised at $1,850,000 in July 2000. (Tr. 1074-75.) As of the time of the hearing, Vineyard had listed the property for sale at $2,500,000 (Tr. 287-88, 319), and an offer in that amount has been received apparently contingent upon securing approval for condominium development. As of July 2, 2002, Vineyard had not accepted this offer.

## F.    Vineyard's Efforts to Amend the Ordinance

After entering into the contract to purchase 1800 Ridge, Vineyard filed (1) a Petition for Text Amendment to § 6-15-2-3 of the Ordinance to add "Religious Institutions" as a permitted use or, in the alternative, a special use in the O1 District; and (2) an application for special use requesting that Vineyard be allowed to use the subject property as a religious institution.[8] (Petition to Amend Evanston Zoning Ordinance, PX 3; City of Evanston Application for Special Use ("First Special Use Application"), PX 4.) These applications were made pursuant to the City's coordinated Review and Approval procedure. (Tr. 360; Ordinance § 6-3-4-8.) Under that procedure, initially, an individual or organization files a petition with the zoning administrator's office. A hearing is then scheduled

---

[8]    It is unclear precisely when Vineyard first filed its application. As noted below, Evanston's Plan Commission held a hearing on the application on December 11, 1996. The special use application submitted to the court is dated January 10, 1997. (Pl.'s Ex. 4.)

before the City Plan Commission ("Plan Commission"). If the matter deals with a specific piece of property, the zoning administrator notifies neighbors, property owners, and taxpayers of record within 500 feet. (Tr. 350.) After the hearing, the Plan Commission makes a recommendation as to whether the City Council should adopt an ordinance granting the petition amendment or not. The City Council then considers the recommendation and either adopts or does not adopt the amendment. (Tr. 351.) If the applicant for an amendment also seeks a special use (in anticipation of the City Council granting the request for the amendment), the applicant can follow the "coordinated procedure," in which the City Zoning Board of Appeals ("Zoning Board") conducts a hearing on the special use simultaneous to the hearing on the amendment. Sometimes the Zoning Board and the Plan Commission hold joint hearings to consider both requests. (Tr. 352.)

The Plan Commission acted favorably on Vineyard's Petition for Text Amendment. On December 11, 1996, the Plan Commission recommended that the City Council amend the Ordinance to include "religious institutions" among the special uses listed for the O1 District. (Ans. ¶ 39.) The Zoning Board also acted favorably, approving Vineyard's Application for Special Use on February 4, 1997. The Plan Commission issued its written recommendation in favor of Vineyard's Petition on February 12, 1997. (*Id.*; Plan Commission Recommendation of 2/12/97, PX 6; Memo from Arthur Alterson, Evanston Zoning Administrator, to David Jennings, Traffic Engineer, of 2/14/97.)

Evanston's City Council was less favorably disposed. On May 5, 1997, the City Council voted to reject the Plan Commission's recommendation. Having thus refused to amend the Ordinance to include "religious institutions" among the special uses in O1 Districts, the City Council did not vote on the Board of Appeals' recommendation that Vineyard be granted a special use to use the subject property as a church. (Ans. ¶ 49; Minutes from Evanston City Council Meeting of May 5, 1997, PX 15.)

Despite this setback, Vineyard proceeded to complete the purchase of the subject property

two days later, on May 7, 1997. (Tr. 151.) Reverend Hanawalt explained that Vineyard concluded that the subject property would be useful for the church's operations, offices, and other cultural activities, even if it could not be used for worship services. (Tr. 151-52.) And he was optimistic that once the City Council saw that Vineyard had tax exempt status anyway, the Council would no longer have any incentive to bar Vineyard from holding worship services at the site. (Tr. 152-153.)

On July 20, 1998, Vineyard filed suit in state court to challenge the City's denial of Vineyard's zoning requests. *Vineyard Christian Fellowship of Evanston v. City of Evanston*, 98 CH 9541; (Ans. ¶ 65.) Vineyard voluntarily dismissed the suit without prejudice on January 12, 1999. (*Id.* ¶ 66.)

On March 15, 1999 Vineyard again filed with the City (1) a Petition for Text Amendment to Section 6-15-2-3 of the Ordinance to add "Religious Institutions" as either a permitted or special use in O1 Districts, and (2) an Application for Special Use requesting that the subject property be allowed for use as a religious institution. (Petition to Amend the Evanston Zoning Ordinance of 3/15/99, PX 22; Application for Special Use of 3/15/99, PX 23; Ans. ¶ 67.) These applications were similar to the zoning applications that the church had submitted in 1996 and 1997, and were again filed under the City's coordinated Review and Approval procedure. (Ans. ¶ 68; Tr. 388; Ordinance § 6-3-4-8.)

The results of Vineyard's second application echoed those of its first. On April 6, 1999, the Zoning Board voted to grant a special use to permit the subject property to be used for a religious institution; the Board issued a written recommendation on May 12, 1999. (Ans. ¶ 69; City Zoning Board of Appeals Recommendation of 5/12/99, PX 27.) On April 14, 1999, the City Plan Commission voted to amend the text of the Ordinance to include "religious institutions" among the special uses listed for the O1 District; on May 11, the Commission issued its written recommendation to that effect. (Ans. ¶ 70; City Zoning Plan Commission Recommendation of 5/11/99, PX 26.) On June 28, 1999, the City Council voted to reject the Plan Commission's

11

recommendation to approve the amendment of the Ordinance's text, and consequently did not vote on Vineyard's application for special use. (Ans. ¶ 71; City Council Minutes of 6/28/99, PX 31.)

## G. Vineyard's Current Use of 1800 Ridge and other Properties in Evanston

From 1991 to the present, Vineyard's congregation has rented space at Evanston High School under a series of annual leases that allow use on Sunday morning only. (Answer to Plaintiff's Request to Admit ("Ans. to Pl.'s Req.") ¶ 78; Tr. 246-47; Leases between Vineyard and Evanston Township High School District 202, PX 1.) The church uses the high school only for Sunday worship and children's Sunday School; accordingly, Vineyard has had to rent at least ten other facilities for baptisms, weddings, and funerals. (Tr. 250-51; 273.)

Holding weekly worship services at a rented location has been burdensome to Vineyard and its congregation. Renting space for worship has required Vineyard volunteers to prepare the rented space for worship on a weekly basis; exposed the church to temporary or permanent displacement; required it to accept its landlord's lighting and sound preferences; and raised security concerns for church members interacting with other people using the high school's facilities on weekends. (Tr. 251-52.) Renting the high school auditorium and exercising various options within the rental lease costs Vineyard almost $100,000 a year for a 90 minute service each week (PX 1; Tr. 253); Mr. Hanawalt estimates that if worship were permitted at the 1800 Ridge location, Vineyard's cost to operate the property seven days a week, even including the additional expense for worship services, would be approximately $120,000 a year.[7] (Tr. 253; Hanawalt Supp. Aff. ¶ 7.)

Soon after purchasing the subject property, Vineyard began using the building's second floor for administrative offices and other church-related administrative activities, including seminars; classes; meetings; counseling; a tape and book library; meals; and rehearsals for and recordings of musical, dramatic and dance productions. (Tr. 171.) Vineyard's original plan for the subject

---

[7]     Vineyard has not explained how much Vineyard currently spends to operate 1800 Ridge without including worship services.

12

property included a sanctuary on the first floor. (Tr. 301.) After the City voted for the first time, in 1997, not to amend the Ordinance, Vineyard built a multi-purpose auditorium, which occupies the western two-thirds of the ground floor. (Tr. 174-75; Subject Property Floor Plan, PX 35.) The central part of the floor is a lobby area with a kitchen. (Tr. 175; PX 35.) The eastern portion of the floor, which now houses approximately 500 fixed seats, is an undeveloped area which Vineyard would like to use for worship. (Tr. 175.) In operating the auditorium as a cultural facility, Vineyard has hosted concerts, lectures, theatrical events, coffeehouses, Christmas pageants, wedding receptions, dances, photography exhibits, and guitar classes. (Tr. 174, 177, 189-90.) Vineyard typically uses the auditorium three or four times a week for large group meetings, leadership training, educational events, youth events, liturgical dance presentations, coffeehouses and other musical events, and music rehearsals. (Tr. 190-91.) Vineyard has not used the subject property for worship services, except for services on December 24 and 31, 2000, pursuant to a preliminary injunction granted by this court. *Vineyard Christian Fellowship v. City of Evanston*, N.D. Ill., No. 00 C 0798 (Dec. 12, 2000).

Vineyard has found the subject property useful for all permitted uses: owning 1800 Ridge has saved time on publicity; has made Vineyard's facilities accessible, easy to find, and close to public transportation; has been convenient for Vineyard's counseling ministry; and has made members of the congregation feel safe parking for night meetings. (Tr. 258-59.)

Evanston acknowledges that from 1997 to the present, neither Vineyard's uses of the subject property, nor parking incident to Vineyard's activities, has had any adverse effect on properties adjacent to or in the immediate neighborhood of the subject property. (Defendant's Response to Request to Admit ("Def.'s Adm.") ¶ 17, Supplemental Answers to Request to Admit ¶ 18.) The City concedes further that Vineyard's actual use of the subject property from 1997 until now has not caused any problems or adverse effect with regard to the environment, pollution, noise, water, sewer, public health, safety, or public morals. (Supplemental Answers to Request

13

to Admit ¶¶ 30, 32, 36, 42.) The City has neither cited Vineyard for any violations nor commenced any enforcement action under the Ordinance with regard to Vineyard's actual uses of the subject property since its acquisition. (Response to Pl.'s Request to Admit, ¶ 48, Tr. 708.)

## H.     Vineyard's Proposed Uses of the Property

Vineyard's zoning applications proposed a worship auditorium of 700 seats for the east side of the subject property's first floor. If the church is allowed to proceed, it will "probably" initially construct a sanctuary with the 500 fixed seats that currently occupy the eastern third of 1800 Ridge's first floor. (Tr. 186.) In summarizing this proposal, the church's pastor noted that Vineyard's congregation has shrunk, that it had been given the 500 fixed seats by a school, and that it would also contemplate holding multiple worship services on Sundays if it were allowed to worship at the subject property. (Tr. 186-87.)

## I.     The City's Rationales for the O1 District

Evanston has a lower per capita tax base than many comparable Chicago suburbs. The City's per capita equalized assessed valuation ("EAV"), the total value of the property in a city divided by its population, is $15,951, a figure below the EAVs of its neighboring or comparable communities of Highland Park ($38,243), Wilmette ($28,488), Glenview ($27,233), Des Plaines ($24,737), Skokie ($22,979), Naperville ($22,241), Arlington Heights ($21,079), and Mount Prospect ($21,079). (Tr. 1232; "Evanston's Tax Base Low by Comparison" Table, Defendant's Exhibit ("DX") 15.) Similarly, Evanston's per capita revenue from sales tax, at $96, trails the corresponding revenues for Highland Park ($243), Skokie ($223), Des Plaines ($169), Naperville ($148), Arlington Heights ($134), Glenview ($124), Mount Prospect ($120), and Wilmette ($103). (Tr. 1233, DX 15.) The only listed suburb behind Evanston in either category is Oak Park, which has an EAV of $12,201 and a per capita sales tax revenue of $59. (DX 15.) James Wolinski, director of community development for Evanston, testified that as of February 9, 2001, the City

14

anticipated a 1.3 percent deficit between projected revenues and projected expenditures for the upcoming budget year. (Tr. 948-49.) The gap, in dollars, that existed as of that date between the revenues and the proposed expenditures was approximately $1.3 million. (Tr. 949.)

As a religious institution, pursuant to Illinois law, 35 ILCS 200/15-40, Vineyard currently pays no taxes on the subject property. (Tr. 261.) On June 18, 1998, the Illinois Department of Revenue ("IDOR") declared a 50 percent tax exemption on the subject property for the 1997 tax year, when Vineyard was using only one of its two floors. (Tr. 261-62; IDOR Non-Homestead Property Tax Exemption Certificate of June 18, 1998, PX 39.) The church paid approximately $16,000 in taxes on the undeveloped portion of the building for tax years 1997 and 1998. (Tr. 263.) On August 24, 2000, after Vineyard developed its first floor and applied for a tax exemption, the IDOR approved a 100 percent exemption for the subject property. (Tr. 263-64; IDOR Non-Homestead Property Tax Exemption Certificate of June 18, 1998, PX 40.) The City appealed the IDOR's 1998 determination, and on March 13, 2000, an Administrative Law Judge upheld the decision to exempt 50 percent of the subject property for 48 percent of the 1997 tax year (48 percent representing the portion of the year Vineyard occupied the building) and 100 percent of Vineyard's parking area at the subject property. www.revenue.state.il.us/legalinformation/ hearings/pt/pt00-12.pdf. The court is unaware of whether Evanston contested the 100 percent exemption.

Michael MaRous, an expert witness called by the City, is the president of MaRous and Company, a real estate appraisal and consulting firm. (Tr. 1050.) He has worked in that field for over 20 years and has appraised all types of real estate during that time. (*Id.* at 1051.) MaRous estimated that if the subject property were used for office purposes, it would generate approximately $160,000 annually in real estate taxes payable to the City's various taxing bodies. (Tr. 1083.) As Vineyard notes, however, offices and cultural facilities are permitted uses in the O1 District whether the user is a taxable or tax-exempt entity. (Tr. 420-21; 962, 964, 967.) Similarly,

membership organizations are allowed as special uses in the O1 District whether they are taxable or tax-exempt. (Tr. 421.) Presumptively tax-exempt government institutions are also permitted in the O1 District. (Tr. 548, 963.) Specifically, the 1986 General Plan in effect at all times relevant to this litigation provided that

> While not always recognized, there is a relationship between the City's cultural resources and the vitality of local business. Dollars spent on the arts in Evanston have economic impacts throughout the community. For each dollar spent on a theater ticket or admission to a gallery, additional dollars are spent on meals and other goods.

(PX 46, at 88-89.) The General Plan lists as general objectives, "[p]romot[ing] the development and growth of the City's cultural resources such as art centers, museums, theaters, historical associations . . . specialized libraries and other facilities of educational, cultural and economic value" and "[e]ncourag[ing] inclusion of cultural facilities in large development or redevelopment projects in the downtown by providing incentives in appropriate zoning and development regulations." (PX, at 90). The General Plan also lists the "identification of potential space for arts activities" and the "identification of potential arts space in business and commercial areas" as "examples and possibilities" of forward-looking goals for the City. (Id.) Wolinski testified that the potential revenue sources for the City from a cultural facility would be in the form of sales tax, retail tax, or an amusement tax. (Tr. 938-39.) He also stated that cultural organizations tend to have a wide variety of clients and, because they bring people into the area on a regular basis, attract more potential shoppers and diners to City businesses. (Tr. 951.)

Steven Lenet, an expert witness for Vineyard, testified at the preliminary injunction hearing before this court that the distinction between cultural and religious institutions in the zoning ordinance was unusual. (Preliminary Inj. Tr. 53.) Lenet, who has written several zoning codes in other cities and villages in Illinois, stated that he was unaware of another city or village in the state that did not consider religious institutions to be in the same category as cultural or membership organizations. (Id.)

16

The General Plan also articulates objectives and policies for the City's Central Business District.[8] City policies include "[m]aintain[ing] the balance of the Central Business District by encouraging activities such as . . . cultural and service functions . . . that complement the role of the Central Business District as an office center"; "[e]ncourag[ing] multiple use facilities to conserve and to make the most efficient use of the high value land in the Central Business District"; "[e]ncourag[ing] creation of facilities, especially those with direct street access, which serve cultural purposes"; and "[c]ontinu[ing] to pursue refinements of the zoning ordinance intended to stimulate economic revitalization of the Central Business District." (PX 46, at 32.)

One of Evanston's objections to Vineyard's using the subject property for worship services relates to the absence of adequate parking in the area and the traffic that might be generated if Vineyard were permitted to hold worship services at 1800 Ridge. Vineyard currently uses approximately 300 parking spaces for a single Sunday service. (Tr. 293.) Hanawalt explained that under its initial contract with the seller, Vineyard would have purchased one half of the west parking lot behind 1740 Ridge, the building just to the south of the subject property. (Tr. 154.) However, the boundaries changed in the final contract for sale of the property because Vineyard arrived at an agreement with the seller for an easement that would allow Vineyard to use all three parking lots that had been part of the original joint property on weekends and evenings. (Tr. 154-55, PX 11.) Hanawalt testified there were 12 legal parking places in front of the building and nine on the street west of the property. (Tr. 161.) On Asbury Avenue on Sundays there are 20 parking places north of Lyons and 20 south of Lyons on the west side of the street (Lyons runs east-west and lies one block north of Church Street, making it a very short walk to the subject property). Parking is also available across Ridge Avenue; all down Clark Street and Oak; and west of Asbury on Lyons there are three blocks of on-street parking. (*Id.*) Had the City Council action been favorable to Vineyard,

---

[8]     The subject property lies within the area included in the General Plan's map of the Central Business District. (PX 46, at 30.)

Hanawalt asserted, the church would have and could have negotiated additional parking easements. (Tr. 164.) In the event Vineyard could not find enough nearby parking, the church planned to use shuttle buses to transport people from the El stop to the church. (Tr. 166.) Vineyard has never had parking problems for its weekend or evening use of the property. (Tr. 191.)

Robert B. Hamilton, Vineyard's expert witness on traffic and parking,[9] testified that on Sunday mornings there would be approximately 250 spaces available within a 1200-foot distance (as required of the City code) of the subject property. (Tr. 856.) Hamilton stated that based on his understanding of the City code, no additional parking would be required at the site simply because of a change in use, since its old number of required parking spots would be essentially grandfathered. (Tr. 883.) If Vineyard's proposed change were considered a new use, resulting in application of the code as if it were a new building, Vineyard would be required to show the availability of one space for every ten seats in the subject property. (Tr. 884.) Assuming a sanctuary of 700 seats, at least 70 parking spaces would have to be available. The code also permits the use of off-site lots and on-street parking to meet the requirement, as long as they are within 1200 feet of the subject property. (Id.) Hamilton concluded that the parking available surrounding the property is sufficient to meet the code's requirements. (Tr. 887.) Hamilton compared these requirements to those imposed by the Evanston code on Vineyard's use of the subject property as a cultural institution. (Tr. 885.) The code imposes a requirement of one spot per ten seats on cultural facilities, just as for religious facilities, but then imposes a few additional requirements, such as increased parking for employees. Therefore, Hamilton observed, cultural facilities with the same seating capacity as religious facilities would always require slightly more

_____

[9]     Hamilton is a registered professional engineer practicing in the areas of traffic and civil engineering. He has been a professional engineer for 26 years, and has provided substantial engineering services to municipalities for several years.

parking. (*Id.*)

Regarding traffic, Hamilton also testified that worship services at the subject property should have a minimal impact on traffic because the Sunday morning services occur at a time in which the surrounding roadway can handle it. (Tr. 853, 857.) Hamilton studied traffic patterns near the subject property and compared it to data collected by Vineyard on Sunday, March 28, 1999, from 8:30 a.m. to 1 p.m. (PX 38.) Hamilton stated that use of the subject property as offices, which would likely generate more weekday traffic, would be "perhaps the worst condition," from a safety point of view. (Tr. 865.) Hamilton also compared the church's current use during evenings and weekends, as a cultural facility, with its proposed use as a site for Sunday morning worship, and concluded that the cultural use, particularly in the early evenings when traffic is still high, would have a more negative impact on traffic and safety than the Sunday use. (Tr. 865-66.) By the end of a weeknight event, Hamilton conceded that the traffic impact would be similar to what would happen on Sunday mornings. (Tr. 867.)

Willard Anthony Alroth, Evanston's expert on traffic and parking, and a member of the Institute of Traffic Engineers, stated that if Vineyard's proposed 700-seat facility were filled, he anticipated the need for more than 340 parking spaces. (Tr. 1012-1013.) Based on his observations, Alroth concluded that approximately 111 parking spaces were available on site. (Tr. 1013.) Alroth hypothesized that there could be serious congestion produced at the driveway to the subject property, particularly if the lot is filled. (Tr. 1017.) He did not explain whether churches are distinguishable from cultural facilities with respect to traffic and parking. Alroth and Hamilton both noted that the access to the 1800 Ridge site from the north is restricted because of a barrier median, thereby only allowing right turns to access the property from the north. (Tr. 872-73, 1014.)

19

I.    **Equal Protection**

Plaintiff argues that the Ordinance violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article 1 § 2 of the Illinois State Constitution.[10] In particular, Vineyard contends that the Ordinance allows some similar uses (i.e. cultural facilities) to operate as permitted uses in the O1 District and allows other similar uses (i.e. membership organizations) to operate as special uses in the District, while religious institutions are prohibited from locating in the District. The court inquires first whether denying Vineyard the right to conduct worship services within the O1 District deprives Vineyard of the equal protection of the laws. In other words, the court first analyzes Vineyard's "as applied" challenge to the ordinance. If Vineyard's equal protection rights have been violated, there will be no occasion to decide whether the ordinance is facially invalid. *See City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 447 (1985) (courts should avoid making unnecessarily broad constitutional judgments).

The Equal Protection Clause mandates that no state shall "deny to any person within its jurisdiction the equal protection of the laws." This clause is "essentially a direction that all persons similarly situated should be treated alike." *Cleburne,* 473 U.S. at 439. "Equal protection limits the power of a legislature to target a particular individual, organization, or group by requiring that the legislature confer benefits or impose costs on a larger, neutrally defined group; it cannot pick on just the most vulnerable." *L C & S, Inc. v. Warren County Area Plan Com'n,* 244 F.3d 601, 602 (7th Cir. 2001). The Supreme Court has established the following standards for determining the validity of state legislation such as zoning ordinances under the Equal Protection Clause: "Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect

---

[10]    Equal protection challenges brought under the Illinois Constitution are evaluated under the same standards as equal protection challenges claims under the federal constitution. *Nevitt v. Langfelder,* 157 Ill.2d 116, 124, 623 N.E.2d 281, 284 (Ill. 1993).

classifications such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classifications challenged be rationally related to a legitimate state interest." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

If the legislative classification negatively affects such a suspect class, then courts may uphold the classification only if it is "precisely tailored to serve a compelling governmental interest." *Sklar v. Byrne*, 727 F.2d 633, 636 (7th Cir. 1984) (quoting *Plyler v. Doe*, 457 U.S. 202, 216-17 & n.14 (1982)). Absent an invidious or gender-based classification, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440 (citations omitted). Further, interpreting this jurisprudence in the context of an equal protection challenge to municipal land use decisions, our Court of Appeals has explained: "Absent a fundamental right or a suspect class, to demonstrate a viable equal protection claim in the land-use context, the plaintiff must demonstrate 'governmental action wholly impossible to relate to legitimate governmental objectives.'" *Forseth v. Village of Sussex*, 199 F.3d 363, 370-71 (7th Cir. 2000), citing *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995) and *Olech v. Village of Willowbrook*, 160 F.3d 386, 387-88 (7th Cir. 1998), *aff'd*, 528 U.S. 562 (2000) (explaining that the Equal Protection Clause can be invoked by an individual who can prove that action taken by the state was a spiteful effort to "get" him) (additional citation omitted).

The court begins by considering the question of whether the Ordinance classifies on the basis of religion. In *Love Church v. City of Evanston*, 671 F.Supp. 515, 518-19 (N.D. Ill. 1987), *vacated on other grounds*, 896 F.2d 1082 (7th Cir. 1990), Judge Grady of this court concluded that an earlier Evanston zoning ordinance, which similarly prohibited churches from certain city districts, classified on the basis of religion, thus necessitating strict scrutiny. In a persuasive opinion, Judge Grady posed the following scenario:

Suppose, for example, a group of people wished to assemble on a regular basis in

21

> Evanston to discuss and hear lectures on classical literature. This group might also wish to have seminars for young people after school or on weekends to expose them to "great books." These people could rent a building in any business or commercial zone and have their meetings. But if that same group of people wished to assemble for the purpose of religious worship and to hold classes for its young people to educate them about religion, they would have to get special permission from Evanston.

*Id.* at 518. The court concluded, "The only distinguishable feature of the groups in our hypothetical is the purpose and content of the assembly. Because Evanston's ordinance distinguishes between religious assembly uses and non-religious assembly uses, it classifies on the basis of religion." *Id.* at 518-19.

Vineyard offered a similar, persuasive argument in this case: Vineyard's congregants may permissibly stage (at the subject property) a production of the musical play "Fiddler on the Roof," which includes a scene depicting a traditional Jewish wedding. Vineyard may not, however, host an actual religious wedding at 1800 Ridge under the zoning ordinance. These simple examples satisfy the court that the City's ordinance, although it does not single out a particular religious group, nevertheless classifies on the basis of religion. The court in *Love Church* noted that just because other, non-religious uses were also prohibited from the district, does not mean the ordinance does not classify on the basis of religion. *Id.* at 517-18. Rather, the significant inquiry is whether religious institutions are treated differently from their similarly situated counterparts, and the court concludes here that they are. Cultural organizations are permitted in the O1 District, and membership organizations may be permitted as special uses. Theaters, like churches, often bring together large groups of people of all ages to participate in a common experience. Many cultural, religious, and membership organizations hold ceremonies, social functions, fundraisers, and other common activities. The court concludes that the major difference between the permitted and special use organizations on the one hand, and Vineyard on the other, is that Vineyard wishes to conduct worship services at its property. Evanston's claim that it has zoned purely for land use purposes and not on the basis of religion is not supported by the facts, and its classification on the

22

basis of religion is therefore suspect.

The court notes that its conclusion in this case does not mandate this result in all future cases where a zoning ordinance specifically classifies religious institutions. If, for example, religious institutions are treated the same under a zoning ordinance as their similarly situated counterparts (such as cultural and membership organizations), a court might well conclude that the classification is not on the basis of religion, and therefore require the municipality only to show a rational basis for its zoning code.

This was the case in *C.L.U.B. v. City of Chicago*, 157 F.Supp.2d 903, 906 (N.D. Ill. 2001), where the zoning ordinance at issue required churches, as well as clubs, lodges, meeting halls, recreation buildings, and community centers to obtain special use permits to locate in business and commercial districts in the city.[11] Significantly, the previous version of the Chicago ordinance and the one that was originally challenged in *C.L.U.B.* treated these entities differently; churches were treated as special uses, while the other entities were permitted as of right. *Id.* The city actually amended the ordinance in response to the litigation and possibly in response to an earlier ruling in the case denying the city's motion to dismiss the plaintiff churches' equal protection claim. *C.L.U.B. v City of Chicago*, No. 94 C 6151, 1996 WL 89241, *24 (N.D. Ill. Feb. 27, 1996). In a subsequent ruling on summary judgment, the court applied the rational basis test, and emphasized that under the amended ordinance, most of the uses allegedly similar to churches received the same treatment. 157 F.Supp. at 912. The *C.L.U.B.* case is currently before our Court of Appeals. Without the benefit of that court's guidance, this court concludes that the Chicago ordinance's classification of churches, as well as cultural and membership organizations, as special uses in the business and commercial districts is the critical distinction between that case and the present one.

---

[11]      The zoning ordinance prohibited churches completely from the city's manufacturing districts but apparently did permit the other entities in those zones. *Id.* The court apparently concluded this was rational because only churches were permitted as of right in the city's residential neighborhoods. *Id.* at 912.

In this case, it is clear that Evanston does classify on the basis of religion. The fact that Vineyard is permitted to run a non-profit cultural facility on its site, but may not hold worship services there, supports this conclusion.

Upon determining that the ordinance classifies on the basis of religion, the court must inquire whether the provision of the ordinance creating the O1 District furthers a compelling interest and is narrowly tailored to meet that interest. Evanston has proffered the following reasons for keeping religious institutions out of the O1 District: traffic congestion and parking problems that would arise if Vineyard were allowed to hold Sunday morning worship services; the need to encourage commercial and business uses in the district in order to enhance the City's economic profile and raise tax revenues; and the importance of creating more office space in Evanston. There is no doubt that these are important goals for a city, and Evanston's desire to compete with some of its more affluent neighbors is both understandable and acceptable. The court concludes that as applied in this case, however, the zoning ordinance does not advance these significant goals.

As discussed previously, Evanston currently allows Vineyard to conduct many of its activities at the 1800 Ridge property, but does not permit Vineyard to hold worship services there. The City argues that even tax-exempt cultural organizations are preferable to religious institutions because they tend to draw more people into Evanston who will dine in the City's restaurants and visit the City's shops. Evanston offered no evidence, however, that people attending church services *do not* eat in City restaurants or shop in Evanston stores. Furthermore, with respect to the 1800 Ridge property, there is no evidence that there are any nearby stores or restaurants catering to theater or church goers.

In addition, Vineyard currently enjoys tax-exempt status with respect to the subject property. There has been no evidence presented that a tax-exempt cultural institution at 1800 Ridge would generate more revenue for the City than a religious institution. Evanston argues that certain

cultural institutions do generate revenue and draw people to the City, but the court concludes that the ordinance was simply not written to ensure this result. The ordinance allows *any* cultural organization; and with the Zoning Board's permission, membership organizations (as special uses) to reside in the O1 District, regardless of their tax status and potential to generate revenue. Therefore, with respect to 1800 Ridge, Evanston's argument that cultural institutions are more profitable for the City is a non-starter.

There is at best conflicting testimony regarding the effect on traffic and parking if Vineyard were allowed to hold Sunday worship services at the subject property. Hamilton testified that a cultural organization with seating for 700 would require *more* parking spaces than Vineyard needs under the City's code. He concluded that Vineyard would have no trouble meeting its parking needs, even if its need exceeded the City's requirements. Hamilton pointed out further that allowing Vineyard to hold Sunday morning worship services would have little impact on traffic because there is little other traffic on Sunday mornings. MaRous testified for Evanston that there could be a severe encroachment into the residential neighborhood to the west of the subject property, not only from the increased traffic but particularly in terms of the demand for parking on Sundays and other major holidays, but he reached this conclusion without the benefit of data or study. The court is not persuaded by Evanston's argument about the ill effects on parking and traffic a church would have in this neighborhood. In any event, even if the court were to consider Evanston's interests to be compelling, the O1 District is not narrowly tailored to meet its goal.

The court acknowledges that few other courts have opted to apply strict scrutiny to zoning ordinances in analogous cases. *See C.L.U.B.*, 157 F. Supp. 2d at 910-11 (applying rational basis review to equal protection challenge in part because church owners were not suspect class); *International Church of the Foursquare Gospel v. City of Chicago Heights*, 955 F. Supp. 878, 881 (N.D. Ill. 1996) (dismissing equal protection challenge to zoning ordinance excluding churches from district under rational basis standard); *see also Cornerstone Bible Church v. City of Hastings*, 948

F.2d 464, 471-72 and n.13 (8th Cir. 1991) (absent evidence of purposeful discrimination based on religious status, the rational basis standard should apply). In this court's view, however, even the more lenient rational basis test leads to the conclusion that Vineyard's equal protection rights have been violated. Rational basis review requires the court to examine whether permitting Vineyard to hold worship services at the subject property "would threaten legitimate interests of the city in a way that other permitted uses . . . [such as cultural centers] would not." *Cleburne*, 473 U.S. at 448. In *Cornerstone Bible Church*, 948 F.2d 464, the Eighth Circuit analyzed a Minnesota city's zoning ordinance that excluded churches from its central business district. In reversing the district court's grant of summary judgment to the defendant on the equal protection issue, the court stated that "[u]nder the equal protection clause we must consider whether the City has a rational basis to differentiate between the Church and the entities it permits in the C-3 zone. Any differentiation must be relevant to the objectives the City is attempting to achieve through its ordinance." *Id.* at 471 (citation omitted).

The question is whether it is rational to treat worship services differently than, for example, a meeting of the Masons, or a production of "Fiddler on the Roof." The record does not clarify how the characteristics of religious worship rationally justify denying Vineyard the right to use the property for religious services. The court fails to see any basis for Evanston's argument that allowing Vineyard to conduct worship services at 1800 Ridge would pose any threat to the City's legitimate interests. With respect to parking and traffic, the evidence shows that in fact, cultural institutions have the potential to pose greater problems for the City than Vineyard, nor is there any evidence suggesting that Vineyard would not abide by City ordinances regarding traffic and parking. The City's argument about generating revenue is more compelling, but again, Evanston has not offered an adequate explanation for permitting tax-exempt cultural institutions and membership organizations to operate in the O1 District, possibly including facilities with no potential for generating revenue. For these reasons, the court concludes that the City has failed to offer a

rational explanation for treating Vineyard differently from similarly situated institutions such as cultural and membership organizations. *See Cornerstone Bible Church,* 948 F.2d at 471 (remanding to the district court the question of whether the city had a rational basis for excluding churches from the city's central business district, when the city offered no rational justification for its distinction between churches and other non-commercial entities, such as Alcoholics Anonymous and the Masonic Lodge.)

As noted earlier, the court suspects that a simple amendment to the ordinance could readily solve Evanston's problem in a way that eliminates the unequal treatment. For example, the City could potentially bar not for profit cultural institutions from the O1 District, or it could allow religious institutions as permitted or at least as special uses.

## II.   Free Speech and Assembly

In Counts IV and V, Vineyard asserts that the City's exclusion of religious institutions from O1 Districts and the City's refusal to amend the Ordinance in response to Vineyard's petitions violate the congregation's rights to free speech and assembly.[12] Evanston argues here, as in the free exercise realm, that the Ordinance governs the location of Vineyard's land use and not the exercise of its First Amendment right to free speech. Evanston argues further that the Ordinance derives from compelling government interests sufficient to withstand judicial review.

### 1.   Speech or Non-expressive Conduct?

As an initial matter, the court must determine whether an ordinance that limits the location of "religious institutions" regulates speech potentially protected by the U.S. Constitution or merely

---

[12]      For purposes of this analysis, the court treats First Amendment claims for freedom of speech and freedom of assembly alike. *New York State Club Ass'n, Inc. v. City of New York,* 487 U.S. 1, 13 (1988). The court will also analyze claims under the federal and state constitutions together while keeping in mind that protection of these liberties under the Illinois Constitution is broader than under the United States Constitution. *C.L.U.B. v. City of Chicago,* 1996 WL 89241 p.25 (N.D. Ill. Feb. 27, 1996), citing *City of Blue Island v. Kozul,* 379 Ill. 511, 520, 41 N.E.2d 515, 520 (Ill. 1942) (additional citation omitted).

non-expressive conduct unprotected by the Constitution. This is not a settled area of the law. In *Lakewood, Ohio Congregation of Jehovah's Witnesses v. City of Lakewood*, 699 F.2d 303, 307 (6th Cir. 1983), the Sixth Circuit Court of Appeals upheld an Ohio city's comprehensive zoning plan against a First Amendment challenge on the grounds that building and owning a church are a "desirable accessory of worship, not a fundamental tenet of [the appellant's] beliefs." Although the religious congregation argued primarily on free exercise grounds, it also directed the court to *Keego Harbor Co. v. City of Keego Harbor*, 657 F.2d 94 (6th Cir. 1981), an opinion striking down on free speech grounds a zoning ordinance that effectively prohibited adult movie theaters from a town. The *Lakewood* court distinguished what amounted to a free speech precedent on the grounds that the ordinance under review did not absolutely ban worship within the city and left other appropriately zoned areas available to the church. 699 F.2d at 307. Noting that the ordinance "simply regulates a secular activity and, as applied to the appellants, operates so as to make the practice of their religious beliefs more expensive," the *Lakewood* court applied essentially overlapping standards to both an explicit free exercise claim and an implicit free speech claim. *Id.* See also *C.L.U.B.*, 157 F. Supp.2d at 915 (denying free speech challenge to zoning ordinance on grounds that "operation of a house of worship does not equate with 'religious speech' any more than the operation of a shoe store equates with commercial speech").

On the other hand, there are cases stating or implying that zoning ordinances should be read as potential constraints on speech *as well as* the location in which speech occurs. In *City of Renton v. Playtime Theatres, Inc.*, the Supreme Court analyzed a zoning ordinance restricting the location of adult movie theaters. 475 U.S. 41, 46-55 (1986). Notably, in rejecting a First Amendment challenge to the ordinance, the *Renton* court did not distinguish between the constitutionally-protected expressive activity occurring within the theaters and the physical theaters themselves. The challenge to the ordinance failed, in other words, not because zoning ordinances in general govern location and not expression, but because the particular ordinance under review

28

did not violate the First Amendment. In *Schad v. Borough of Mt. Ephraim*, the Supreme Court invalidated convictions under a zoning ordinance barring live entertainment as violations of the First Amendment right to free expression. 452 U.S. 61, 77 (1981). In *Cornerstone Bible Church*, the Eighth Circuit analyzed a restriction on a church's ability to locate in a city's central business district as a restriction on speech, and remanded to the district court the issue of whether the ordinance withstood scrutiny under time, place and manner analysis. 948 F.2d at 468-71. The court noted that the ordinance in question allowed "churches, and by implication organized religious speech" in some zones of the city but not others, "place[d] determinative weight on the fact that the proposed use is a church," and therefore provided that "religious content of the [zoning] applicant's speech can determine whether the City permits it to locate in the [challenged] zone." *Id.* at 468.

In the face of these conflicting precedents, this court concludes that the Ordinance restricts speech and not non-expressive conduct. The most persuasive precedent before the court is the *Cornerstone Bible Church* opinion, which (a) distinguished between free speech and free exercise challenges, noting that a zoning ordinance barring churches from a business district does not significantly burden religious belief but may nevertheless infringe a congregation's freedom of speech; and (b) held that for zoning purposes, the dispositive factor triggering the zoning ordinance in question was ultimately the content of the congregation's speech in its property. Similarly, the Evanston Ordinance at issue in this case prohibits churches but not cultural facilities from the O1 District.

### 2. Standard of Review

In addressing a First Amendment free speech challenge, the court must consider whether the challenged provision is a content-based regulation that restricts speech because of the ideas or messages it expresses. *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 827 (7th Cir. 1999). Such content-based regulations are presumptively invalid. *R.A.V. v City of St. Paul*, 505 U.S. 377, 382

29

(1992). The government may neither favor one viewpoint over another, *see City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804 (1984), nor suppress an entire category of speech, even if the regulation is viewpoint-neutral within the category of speech, because the First Amendment bars "prohibition of public discussion of an entire topic." *See Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 537 (1980).

On its face, the Ordinance's ban of "religious institutions" departs from content-neutrality because it restricts only a single subject of speech.[13] As the Supreme Court has noted, however, even a restriction that treats some forms of speech differently than others may still warrant consideration as a content-neutral measure.[14] Thus, in *Renton,* the Court noted that a content-based zoning ordinance "aimed not at the *content* of films shown at 'adult motion picture theatres,' but rather at the *secondary effects* of such theaters on the surrounding community" was subject to the time, place, and manner analysis reserved for content-neutral speech regulations. 475 U.S. at 47 (emphasis in original). In other words, because the city's codification of its zoning interests was unrelated to the suppression of free expression and was justified without reference to the content of the regulated speech, the Court analyzed Renton's zoning ordinance as content-neutral. *Id.* at 48, citing *Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976).

While the Supreme Court has applied this analysis of purpose most commonly in cases

---

[13]     This was the court's conclusion just before the 2000 holidays, with the result that the court directed Evanston to permit Vineyard to use its property for worship on Christmas Eve and New Year's Eve.

[14]     Although members of the Court have acknowledged the confusion that can result from analyzing explicitly content-based restrictions as "content neutral," the Court has not yet adopted new terminology for this analysis. *See City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 448 (Kennedy, J., concurring) ("The fiction that this sort of ordinance is content neutral [is] . . . perhaps more confusing than helpful . . . These ordinances are content based and we should call them so."); *id.* at 457 (Souter, J., dissenting) ("It would . . . make sense to give a First Amendment label of its own, and if we called it content correlated, we would not only describe it for what it is, but keep alert to a risk of content-based regulation that it poses.").

addressing the zoning of adult theaters and entertainment, see *Renton,* 475 U.S. 47-49 (analyzing

facially content-based restriction on adult movie theatres as content-neutral); *Barnes v. Glen*

*Theatre, Inc.,* 501 U.S. 560, 566 (1991) (plurality opinion) (reviewing state statute constraining

public nude dancing as time, place or manner statute); *City of Erie v. Pap's A.M.,* 529 U.S. 277,

295-96 (same), it has also addressed volume limits on music in a public bandshell, *Ward v. Rock*

*Against Racism,* 491 U.S. 781, 791-92 (1989). *Cf. Boos v. Barry,* 485 U.S. 312, 321-29 (1988)

(invalidating District of Columbia content-based statute prohibiting the display of any sign within 500

feet of a foreign embassy if the sign tends to bring that foreign government into "public odium" or

"public disrepute.")

These considerations led the Eighth Circuit in *Cornerstone Bible Church* to analyze a zoning

ordinance that barred churches from the city's central business district as content-neutral.

Although the court pointed out that the ordinance appeared to constitute a content-based

restriction, the court noted that the Supreme Court's decisions in *Renton* and *Boos* make clear that

"a restriction of speech should be analyzed as content-based only if the asserted justification for

the restriction is content-based." *Cornerstone Bible Church,* 948 F.2d at 468, citing *Renton,* 475

U.S. at 48; *Boos,* 485 U.S. at 320-21; *Ward,* 491 U.S. at 791, quoting *Clark v. Community for*

*Creative Non-Violence,* 468 U.S. 288, 293 (1984) ("Government regulation of expressive activity

is content neutral so long as it is 'justified without reference to the content of the regulated

speech.'")

In *Stokes v. Madison,* the Seventh Circuit addressed an ordinance which specified certain

times during which sound amplification devices could be used on city streets and on public malls,

and governed issuance of parade permits. 930 F.2d 1163 (7th Cir. 1991). The regulations

exempted churches for music amplified on Sundays and religious holidays and created a separate

permit system for amplifying music or other noncommercial messages during the "Christmas

holiday season" and at other times decided by the Parks Commission. *Id.* at 1171. The court

concluded the ordinance was content-neutral because the perceived harm from the regulated speech was its intrusiveness (to some extent proxied by volume) and not its content. "[T]he relevant inquiry is not *who* broadcasts but what the decibel level and the sheer consciousness-piercing quality of the sound may be . . . . The difference is not in 'content' but in the nature of the sound in the context of an environment. In contrast, if the sound amplification ordinance required a screening of each speaker's message, combined with an exemption for religious messages, content neutrality would clearly be violated." *Id.*

The court is satisfied that Evanston's zoning ordinance falls, rather awkwardly, under the content-neutral category. Similar to the zoning restrictions in *Renton*, Evanston's proffered reasons for its ordinance are the secondary effects of houses of worship in the O1 Districts. As in *Stokes*, there is no contention that the City's motives were to target Vineyard's religious messages or those of any other religious institutions. Rather, the goal was to encourage business and economic development in the O1 Districts, a goal City planners believe will be hampered if Vineyard is allowed to hold worship services at 1800 Ridge Avenue. Thus, the restrictions on religious institutions in the Ordinance are analogous to the zoning ordinance in *Renton*, which the Supreme Court analyzed as content-neutral, and the regulations involved in *Stokes*. *Cf. Association of Community Organizations for Reform Now v. Golden* 744 F.2d 739, 749 (10th Cir. 1984) (solicitation ordinance which permits exemption for organizations or individuals if the purpose of the solicitation is for a charitable, religious, patriotic or philanthropic purpose was a distinction based on content.)

Content-neutral restrictions are subject to intermediate scrutiny under traditional First Amendment jurisprudence. *DiMa*, 185 F.3d at 827; *United States v. Wilson*, 154 F.3d 658, 663 (7th Cir. 1998). In sum, government may impose reasonable time, place, and manner restrictions if they (1) are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels

for the communication of the information. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Evanston's justifications for the O1 District's restrictions on religious institutions include concerns associated with traffic, noise and pedestrian safety; maximizing City tax revenue; promoting land use consistent with economic development; preserving capacity for future development in the City; and a City policy of encouraging cultural facilities. Certainly some of these concerns would presumably militate in favor of excluding institutions other than churches as well. Vineyard offered evidence that cultural activities (and potentially membership organizations) also impose traffic, noise, and pedestrian safety concerns - yet those uses are permitted, while religious activity is not. Tax revenue is unquestionably a significant government interest, but the Ordinance arguably exceeds the requirement of "narrow tailoring" to the extent it permits cultural activities and membership organizations to locate at 1800 Ridge Avenue regardless of whether they are or are not tax exempt. (Tr. 420-21; 962, 964, 967.)

That leaves the court with the final two proffered justifications: promoting land use consistent with economic development, and preserving capacity for future development. The expert report by Evanston witness MaRous stated that the highest and best use of 1800 Ridge is development of an office building. He pointed out that there is a growing demand for office space in Evanston. (Defense Exhibit "DX" 17). Ron Kysiak,[15] another expert witness for Evanston, stated that 1800 Ridge is better suited for use by a technology company than a church for worship services. (DX. 20.) Jacques Gourguechon, another defense witness and the author of the zoning ordinance, stated that the purpose of the O1 District was "to secure those few corridors within the City that had a pattern of office use for such uses in order to balance the land use makeup of the City, protect the economic and employment base and most importantly to protect the office

---

[15]     Kysiak has been in public or private economic development since 1969, and since 1984 has been Executive Director of Evanston Inventure, an economic development corporation.

33

component of the City's property base." (DX. 18.) Gourguechon is a professional city planner who currently provides consulting services to municipal and private sector clients, work that includes preparation of comprehensive plans and strategic plans for cities and regions, preparation of regulatory codes including zoning ordinances, special area studies and downtown plans, and other land use and economic development related plans and consulting assignments for public and private clients. (*Id.*)

The court accepts Evanston's arguments regarding the need for more office space and tax revenue generation. The court is nevertheless troubled by what appears to be an underinclusive regulation. Evanston produced some evidence showing that churches tend to displace economic activity to a greater extent than the non-commercial uses the City has allowed in the zone. (Tr. 951.) Wolinski, director of community development for Evanston, testified that persons who attend cultural events are more likely than church-goers to dine in the City's restaurants, or shop in its stores, but he did not explain the basis for his conclusion. (*Id.*) It is undisputed, however, that Vineyard currently uses 1800 Ridge for its administrative functions and also as a cultural facility, and enjoys 100% tax exempt status. No evidence was produced at trial showing that the current use of 1800 Ridge is somehow better or more productive than it would be if Vineyard were also allowed to hold worship services at the site. Wolinski testified that cultural institutions are beneficial to the City; Gourguechon offered a slightly different spin: He observed that another one of the City's reasons for allowing cultural organizations in O1, but not religious institutions, is that there are simply fewer cultural groups in Evanston than churches, and therefore they pose less of a threat to the City's goal of reserving the O1 District for office uses. (DX 18.) Yet Vineyard itself currently operates a cultural institution in the O1 District, and therefore already "threatens" the City's plans. Furthermore, Wolinski testified that the development that has taken place in the O1 District has been predominantly residential since 1993, the year the zoning ordinance was passed, which the court presumes is also inconsistent with the City's plans. (Tr. 968.)

34

Evanston has not adequately explained why it is necessary to restrict the property at 1800 Ridge for cultural, rather than religious, activities. Although treating such uses differently might make sense in the abstract, nothing in this record demonstrates that Evanston is better off financially because 1800 Ridge is operated solely as a cultural, rather than a religious facility. Even under a lenient standard, the court could not characterize this distinction as narrow tailoring. The court therefore concludes that Vineyard's free speech and assembly rights have been violated, and will not reach the issue of whether Vineyard has adequate alternate means of expression.

## III.  Free Exercise

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." U.S. Const., amend. I. Vineyard argues that the Ordinance violates its right to free exercise of religion under the U.S. and Illinois constitutions by preventing it from conducting religious worship services at the subject property.[16]  The free exercise clause of the First Amendment has been made applicable to the states by incorporation into the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). It is settled law that the Free Exercise Clause's protections apply "if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). *See also United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 629 (7th Cir. 2000).

The Supreme Court's free exercise clause jurisprudence has several implications. First, the Constitution absolutely bars governmental constraint on religious belief. *Employment Div., Dept. of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990); *Indianapolis Baptist Temple*, 224 F.3d at 629. Second, if a law burdens the exercise of religion, it requires compelling justification

---

[16]     Free exercise claims under the Illinois Constitution are analyzed using standards from federally-derived free exercise jurisprudence. *Keller by Keller v. Gardner Community Consol. Grade School Dist. 72C,* 552 F.Supp. 512, 515-16 (N.D. Ill. 1982).

unless it is neutral and generally applicable. *Lukumi*, 508 U.S. at 531-32; *Smith*, 494 U.S. at 880-83. Thus, the I.R.S. may collect a general income tax even from citizens who think it sinful to support a secular government. *Smith*, 494 U.S. at 878. Finally, a law that directly burdens religious practice or conduct arising from religious belief but fails to satisfy the requirements of neutrality and general applicability must be justified by a compelling government interest and must be narrowly tailored to advance that interest. *Lukumi*, 508 U.S. at 531-32.

Vineyard has not alleged that the Ordinance constrains religious belief in the sense of outlawing its particular faith or religious doctrine. Rather, the church alleges that the zoning ordinance places a financial and logistical burden on the church's ability to hold worship services at the property. The court notes that prior to the Supreme Court's decision in *Smith*, courts addressing a free exercise challenge would focus their inquiry on whether the challenged measure substantially burdened the exercise of religion. If so, the government was required to demonstrate compelling reasons for such regulation, as well as show that the means were narrowly tailored to meet the government's goals. *Sherbert v. Verner*, 374 U.S. 398 (1963).

*Smith* represented a watershed in the Supreme Court's free exercise jurisprudence; it had the effect of narrowing the number of cases in which courts will strictly scrutinize government actions. After *Smith*, courts are to use strict scrutiny only if a litigant's exercise of religion is burdened by a law which is not neutral or generally applicable. There remains the possibility, discussed in *Smith*, that courts will apply strict scrutiny to a free exercise claim if another constitutional right is at stake. 494 U.S. at 881. Courts have come to refer to this as a "hybrid rights" claim, a theory this court will address *infra*. Under either a direct burden or a "hybrid rights" analysis, *Smith* and subsequent caselaw establishes that before a court is even to analyze whether the law is neutral and/or generally applicable, there must be a burden on religious exercise. *Lukumi*, 508 U.S. at 531. What remains uncertain post-*Smith*, is whether, before the court will consider neutrality/general applicability, the party challenging government action must show that

the burden on religious exercise is a substantial one. The Seventh Circuit has not directly addressed this question, but it has applied the substantial burden inquiry to cases post-dating *Smith. See, e.g., Fleischfresser v. Directors of School District 200,* 15 F.3d 680 (7th Cir. 1994) (upon determining there was no substantial burden on religious exercise, court dismissed free exercise claim without addressing the neutrality/general applicability factors discussed in *Smith*). Furthermore, *Smith* itself appears to have limited the circumstances in which courts are to apply the compelling interest test. Following this lead, this court assumes that to prove its free exercise claim, Vineyard must first demonstrate that its exercise of religion has been substantially burdened by the challenged government action.

The court begins with this issue. Vineyard complains that because it cannot use 1800 Ridge to meet all of its needs, the congregation is forced to spend a considerable amount of money to rent space where worship services may be held. Vineyard complains about the inconvenience of having to set up the worship space in the high school auditorium every week and defer to the high school's needs if there is a conflict. The City asserts that the Ordinance restricts nothing more than the *location* of religious practice and conduct and therefore does not substantially burden Vineyard's free *exercise* of religion.

There is substantial case law which supports the City's proposition. In *Messiah Baptist Church v. County of Jefferson,* for example, the Tenth Circuit held that a zoning regulation forbidding a congregation from building a house of worship did not place a substantial burden on the church because regulation of the location of church construction was not an impediment to religious observance in the sense of a prohibition. 859 F.2d 820, 824-25 (10th Cir. 1988). The court held that financial burdens do not rise to the level of infringement of religious freedom. *Id.* Similarly, in passing upon another challenge to local zoning, the Sixth Circuit observed that "building and owning a church is a desirable accessory of worship, not a fundamental tenet of [a congregation's] religious beliefs." *Lakewood,* 699 F.2d at 307. *Lakewood* was a challenge to

37

defendant city's zoning plan which barred construction of a church on a lot the congregation owned. Under that plan, only ten percent of the city's property was land on which a church could be built. Nevertheless, because the effect of the Lakewood ordinance did not prohibit the congregation or any other faith from worshiping in the city, the court affirmed the judgment of the district court, stating that "[i]nconvenient economic burdens do not rise to a constitutionally impermissible infringement of free exercise." *Id.* at 306. The Evanston ordinance is far less restrictive than the one involved in *Lakewood.* Evanston allows for religious institutions in approximately 90% of its geographic area. (Tr. 399, 1140.)

The Ninth Circuit has stated that the burden on religious practice is not as great when the government action, in that case the denial of a special use permit, does not restrict current religious practice but rather prevents a change in religious practice. *Christian Gospel Church, Inc. v. San Francisco,* 896 F.2d 1221, 1224 (9th Cir. 1990). In that case, the court rejected an application of a congregation to establish a church in a residential neighborhood in which to hold worship services, noting that up until that point the group had been worshiping in the banquet room of a hotel. *Id. See also Cornerstone Bible Church,* 948 F.2d at 472 (municipal ordinance excluding churches from zoned area "has no impact on religious belief and should not be construed as directly regulating religious-based conduct"). Finally, in *Grosz v. City of Miami Beach,* 721 F.2d 729 (11th Cir. 1983), the court upheld the prosecution of a rabbi who conducted worship services in his home in violation of zoning laws that prohibited churches, synagogues and similarly organized religious congregations in single-family residential zones. These cases teach that when churches are permitted in some municipal zoning areas but not others, a congregation does not have a constitutional right to build its house of worship in any area it chooses. Vineyard has made no showing that its religious practices require that worship be undertaken at the subject property. *See Christian Gospel Church,* 896 F.2d at 1224.

Vineyard's hardship does not rise to the same level as the burdens found by the Supreme

Court in *Smith* and *Lukumi*. Both of those cases involved restrictions on the actual content of religious practices. In *Smith,* respondents were fired from their jobs because they ingested peyote for sacramental purposes at a Ceremony of the Native American Church, of which they were members. They were subsequently refused unemployment compensation because they had been discharged for work-related "misconduct." 494 U.S. 872, 874. The Supreme Court held that the free exercise clause did not prohibit application of Oregon drug laws to the respondents, and upheld the state's right to deny their unemployment compensation claims. *Id.* at 890. In *Lukumi,* the City of Hialeah passed an ordinance which prevented members of the Santeria church from participating in religious animal sacrifice. 508 U.S. at 524. In those cases, government regulations prevented, and even sought to punish, activities that were central to the parties' religious practices. By contrast, Vineyard's congregants have not been prevented from worshiping, or from engaging in any activities central to their religious beliefs.

The court does not turn a blind eye to the practical consequences of this ruling. Vineyard's evidence leaves no doubt that its inability to worship at the subject property has been costly and that the church would benefit from owning and administering the facility in which its congregation worships. In light of the caselaw, however, the court concludes that these monetary and logistical burdens do not rise to the level of a substantial burden on Vineyard's constitutional free exercise rights. *See International Church of the Foursquare Gospel,* 955 F. Supp. at 880 (noting that additional expense imposed by zoning ordinances are generally not substantial burdens under the First Amendment). *But see Messiah Baptist Church v. County of Jefferson,* 859 F.2d 820, 831 (10th Cir. 1988) (McKay, J., dissenting) ("It seems to me that . . . the building, maintenance, and use of places of worship qualify for first amendment protection not only because housed worship has been historically central to religion but also because such activities necessarily involve speech and assembly").

The court notes further that while it located federal opinions striking down zoning restrictions

on churches on free exercise grounds, these opinions explicitly distinguish their factual contexts from the one before this court. *See Western Presbyterian Church v. Board of Zoning Adjustment of Dist. of Columbia*, 862 F. Supp. 538, 546 (D.D.C. 1994) ("*Once the zoning authorities of a city permit the construction of a church in a particular locality*, the city must refrain . . . from in any way regulating what religious functions the church may conduct") (emphasis added); *Alpine Christian Fellowship v. County Comm'rs of Pitkin County*, 870 F.Supp. 991, 994 (D. Colo. 1994) (upholding free exercise claim where "plaintiff is not arguing for a right to be free from zoning or to build a church where it pleases" and purchased an "existing church building in a district where a church is a use by right").

Because the court holds that Vineyard has not suffered a substantial burden, the court dismisses the Plaintiff's free exercise claims. There is no need to discuss whether the Ordinance qualifies as neutral or generally applicable under *Smith* and *Lukumi*.[17]

The court recognizes the apparent oddity of concluding that Vineyard's right to equal protection of the laws has been violated, on the one hand, and on the other hand, deciding that Vineyard's right to free exercise of religion has not been substantially burdened. The Eighth Circuit reached the same conclusion however, in *Cornerstone Bible Church*, when it dismissed the church's free exercise claim, but remanded the equal protection claim and directed the district court to apply the rational basis test on remand. 948 F.2d at 471-72. Perhaps this apparent awkwardness arises because equal protection clause jurisprudence does not require a claimant to demonstrate a substantial burden, the necessary hurdle under the free exercise clause. The court is confident that the parties in this case as well as future litigants would welcome further guidance from our Court of Appeals on this complex issue.

---

[17]     The court has previously addressed the parties' arguments concerning the neutrality of the zoning ordinance, but because Vineyard has not shown that its free exercise rights have been substantially burdened, the court need not reach this issue in this context.

## IV.     Hybrid Rights Claim

Even if this court declines to apply a heightened level of scrutiny under the *Smith* and *Lukumi* line of cases, Vineyard urges that strict scrutiny is still appropriate because it has stated a "hybrid" claim; that is, Vineyard has alleged the violation of its free exercise rights in conjunction with other constitutional rights. The use of "hybrid" in this context comes from the Supreme Court's decision in *Smith*, in which Justice Scalia noted that the only cases in which the Court had struck down neutral and generally applicable laws involved free exercise claims in conjunction with some other constitutional claim. *Smith*, 494 U.S. at 881 (citations omitted). In explaining why the facts of *Smith* did not warrant a heightened level of review, the Court indicated that government action imposing burdens on free exercise and other constitutional rights might be subject to a more searching level of review than the rational basis test. *Id. See also City of Boerne v. Flores,* 521 U.S. 507, 513-14 (1997). Justice Scalia's dicta has become known as endorsing a "hybrid rights" claim, in effect creating an exception to the rule in *Smith* and *Lukumi* that only laws which are not neutral or generally applicable can be strictly scrutinized.

Courts have approached the application of "hybrid rights" claims differently. The Sixth Circuit initially rejected the notion of hybrid rights as illogical. *Kissinger v. Board of Trustees of Ohio State University,* 5 F.3d 177, 180 (6th Cir. 1993) ("We do not see how a state regulation would violate the Free Exercise Clause if it implicates other constitutional rights but would not violate the Free Exercise Clause if it did not implicate other constitutional rights . . . . Such an outcome is completely illogical; therefore, at least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard than that used in *Smith* to evaluate generally applicable, exceptionless state regulations under the Free Exercise Clause"). More recently, however, the Sixth Circuit declined to apply the compelling interest test under a hybrid rights theory not because

41

such a theory is untenable but because the plaintiff failed to establish a free exercise violation. *Prater v. City of Burnside,* 289 F.3d 417, 430 (6th Cir. 2002) ("[A]bsent a violation of the Free Exercise Clause, the Church's hybrid-rights theory necessarily fails.").

The Ninth Circuit has taken a different approach. In *American Family Ass'n v. City and County of San Francisco,* 277 F.3d 1114 (9th Cir. 2002), the court dismissed plaintiffs' free exercise claim involving the city and county's formal disapproval of an advertising campaign that espoused the view that homosexuality is a sin. Notwithstanding the absence of a colorable free exercise claim, the court nevertheless proceeded to analyze whether strict scrutiny should apply to the case under the hybrid rights approach. Only upon determining that plaintiffs failed to allege a colorable free speech and viewpoint discrimination claim did the court dismiss the hybrid claim as well. *Id.* at 1123-1125.

The Tenth Circuit has taken an approach similar to the Ninth. In *Swanson By and Through Swanson v. Guthrie Independent School District No. I-L,* 135 F.3d 694, 700 (10th Cir. 1998), the court first considered whether plaintiffs had a viable free exercise claim regarding the school district's refusal to allow their home-schooled child to attend school part time. Upon determining that plaintiffs did not have a colorable free exercise claim, the court proceeded to consider whether plaintiffs' parental rights claim warranted strict scrutiny under a hybrid rights theory. The court concluded that because plaintiffs did not make a colorable showing of a recognized and specific constitutional right, the hybrid rights claim must be dismissed. *Id.*

Our Court of Appeals has yet to address this important issue. The Sixth Circuit's approach in the *Prater* case is appealing, but this court concludes it amounts to no more than a requirement that in order to heighten the level of scrutiny a court will apply, the plaintiff must make out a successful claim under the free exercise clause. Arguably, this approach would eliminate any hybrid rights doctrine. This court therefore will follow the logic of the Ninth and Tenth Circuits, which require that in order for strict scrutiny to apply, a plaintiff must make a showing of a colorable

infringement of one of the other constitutional rights involved in the hybrid claim. Here, Vineyard has demonstrated that its free speech and equal protection rights have been violated, and therefore the case is arguably analogous to those cited in *Smith* as involving hybrid rights. *Smith*, 494 U.S. at 881, citing *Cantwell v. Connecticut,* 310 U.S. 296, 304-07 (1940) (invalidating a licensing system for religious and charitable solicitations under which the administrator had discretion to deny a license to any cause he deemed nonreligious); *Wisconsin v. Yoder,* 406 U.S. 205 (1972) (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school) (additional citations omitted).

Because the court has already applied strict scrutiny to the Ordinance in the equal protection context, to engage in the same analysis here would be redundant. The court therefore reiterates its earlier conclusion that Evanston has failed to demonstrate that the O1 District has been narrowly tailored to meet the City's stated goals.

## V.    Religious Land Use and Institutionalized Persons Act

Vineyard alleges that Evanston's exclusion of the church from the O1 District violates the recently-enacted RLUIPA. 42 U.S.C. § 2000cc. RLUIPA became law on September 22, 2000, and was adopted largely in response to the Supreme Court's partial invalidation of the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb-2000bb-4, in *City of Boerne v. Flores,* 521 U.S. 507 (1997). RLUIPA's land use provisions establish a general rule that no state or local government

> shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden . . . (A) is in furtherance of a compelling government interest; and (B) is the least restrictive means of furthering that compelling government interest.

42 U.S.C.A. § 2000cc(a)(1) (2002). The Definitions portion of the statute provides that under RLUIPA, "land use regulation" means a "zoning . . . law, or the application of such a law, that limits

or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership . . . interest in the regulated land." 42 U.S.C.A. § 2000cc-5(5). RLUIPA also provides that the term "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," and articulates a rule that "the use, building, or conversion of a real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc-5(7). This "strict scrutiny" provision applies when the substantial burden on religious exercise "affects . . . commerce among the several States," 42 U.S.C. § 2000cc(a)(2)(B), or when the substantial burden is imposed "in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit a government to make, individualized assessments of the proposed uses of the property involved." 42 U.S.C. § 2000 cc(a)(2)(C).

Vineyard argues that the Ordinance substantially burdens Vineyard's religious exercise in violation of section (a)(1) of RLUIPA. Vineyard alleges that the Ordinance is discriminatory in that it allows offices and cultural facilities as permitted uses and membership organizations as special uses, while prohibiting all religious institutions from the O1 District. (Am. Comp. ¶¶ 138-139.) Evanston maintains that RLUIPA has not been violated, and argues that in any event, RLUIPA is unconstitutional on nine different grounds. The United States has intervened in this case without opposition in support of the constitutionality of RLUIPA. Determination of the constitutionality of the statute will not be necessary, however, because the court holds that the Ordinance does not violate RLUIPA.

In addressing Vineyard's claim under RLUIPA, the court must first determine whether the facts of the present case trigger one of the bases for jurisdiction provided in the statute. *Prater*, 289 F.3d at 433. Vineyard maintains that Evanston's refusal to amend the Ordinance falls under the parameters of § 2000cc(a)(2)(C). The court agrees that the City Council made an individual

decision in Vineyard's case that impacted the implementation of the land use regulation. RLUIPA defines a "land use regulation" as follows: "[A] zoning or landmarking law . . . that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest." §§ 2000cc-5(5). Under this definition, a government agency implements a "land use regulation" only when it acts pursuant to a "zoning or landmarking law" that limits the manner in which a claimant may develop or use property in which the claimant has an interest. There is no question in this case that the City Council's decision not to amend the zoning ordinance was an act pursuant to the zoning law. In fact, Evanston acknowledges in its post-trial reply brief that "[e]very time a zoning ordinance is amended or every time a property owner seeks a zoning variation or special use, there must be an individualized governmental determination." (Def.'s Post-Trial Reply Brief at 8.) The court is satisfied that Vineyard's claim falls under Section 2000cc(a)(2)(C) of the RLUIPA.

Vineyard's claim under Section (a)(1) of the RLUIPA fails, however, for the same reasons its free exercise claim failed. The history of the statute demonstrates that Congress did not intend to change traditional Supreme Court jurisprudence on the definition of substantial burden. *See Freedom Baptist Church of Delaware County v. Middletown,* 204 F.Supp.2d 857, 868 (E.D. Pa. 2002) ("What Congress manifestly has done in this subsection is to codify the individualized assessments jurisprudence in Free Exercise cases that originated with the Supreme Court's decision in *Sherbert v. Verner,* 374 U.S. 398 (1963) [in which the Supreme Court analyzed a free exercise claim under the substantial burden test]."); *see also* 146 CONG. REC. S7774-01, S7776. "Substantial burden" has been defined or explained in various ways. *See Thomas v. Review Bd. of the Indiana Employment Sec. Div.,* 450 U.S. 707, 718 (1981) (exists where state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs"); *Sherbert,* 374 U.S. at 404 (occurs when a person is required to "choose between following the precepts of

her religion and forfeiting benefits, on the one hand, and abandoning the precepts of her religion . . . on the other"); *Henderson v. Kennedy,* 253 F.3d 12, 17 (D.C. Cir. 2001) (under RFRA,[18] "the proper free exercise inquiry was whether 'the government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden.'") (quoting *Jimmy Swaggart Ministries v. Board of Equalization,* 493 U.S. 378, 384-85 (1990); *Stuart Circle Parish v. Board of Zoning Appeals of Richmond,* 946 F.Supp. 1225, 1237 (E.D. Va. 1996) ("It is well established that there is no substantial burden placed on an individual's free exercise of religion where a law or policy merely 'operates so as to make the practice of [the individual's] religious beliefs more expensive.'") (quoting *Braunfeld v. Brown,* 366 U.S. 599, 605 (1961) (plurality opinion).

As discussed previously in the free exercise section, the court sympathizes with Vineyard's plight, but does not feel that the burden qualifies as substantial. Vineyard has continued to hold worship services. *See Daytona Rescue Mission, Inc. v. City of Daytona Beach,* 885 F.Supp. 1554, 1560 (M.D. Fl. 1995) (no substantial burden where plaintiffs failed to show that city code prevented them from running shelter or food programs anywhere in Daytona Beach); *cf. Western Presbyterian Church,* 862 F.Supp. at 546 (finding that "once the zoning authorities of a city permit the construction of a church in a particular locality, the city must refrain, absent extraordinary circumstances, from in any way regulating what religious functions the church may conduct"). Although Vineyard has undoubtedly suffered serious hardships, first in its attempt to find a suitable property, and, once it found one at 1800 Ridge, in attempting to win approval for the intended uses, the court holds that the Evanston zoning ordinance does not constitute a substantial burden on the

---

[18]       RLUIPA does not define what constitutes a "substantial burden" on religious exercise; however, the Act's legislative history evidences Congress' intent that courts apply the same substantial burden test that was applied under RFRA. *Grace United Methodist Church v. City of Cheyenne,* 235 F.Supp.2d 1186, 1194 (D.Wyo. 2002); 146 CONG. REC. E. 1563 (September 22, 2000) (noting RLUIPA's "general rule" tracks the substantive language of RFRA but limits its scope to land use laws).

exercise of religion, and therefore Section (a)(1) has not been violated.

The RLUIPA also contains provisions protecting religious assemblies or institutions from discrimination or exclusion, and Vineyard has challenged the Ordinance under these sections of the statute as well. Specifically, the statute provides that "no government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution," 42 U.S.C.A. § 2000cc(b)(1), and such governments shall not "impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C.A. § 2000cc(b)(2). Furthermore, governments shall not "impose or implement a land use regulation that . . . unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C.A. § 2000cc(b)(3).

There is very little case law interpreting the § 2000cc(b) provisions of the RLUIPA. And the language of the statute makes it difficult to determine whether Section (b) is to be read as a subset of the general prohibition in Section (a) against substantially burdening religious exercise, or if it is an independent provision. Although the structure of the statute makes the sections appear separate and distinct, the legislative history evinces an intent that Section (a) be treated as a "General Rule," followed by the "specific provisions" of Section (b). 146 CONG. REC. S7775-S7776. The statute's history shows that the provisions of Section (b) "directly address some of the more egregious forms of land use regulation, and provide more precise standards than the substantial burden and compelling interest tests." 146 CONG. REC. E1563-01. This interpretation also makes sense in light of the fact that Section (b) does not set out a separate jurisdictional element as Section (a) does. See 146 CONG. REC. S7774-01 (stating that the land use sections of the bill enforce the free exercise and free speech clauses of the Constitution and therefore are permissible exercises of congressional power under Section 5 of the Fourteenth Amendment).

The analysis of RLUIPA in *Freedom Baptist Church of Delaware,* 204 F.Supp.2d at 861,

also supports the conclusion that (b) is a subset of (a). After quoting Section (a) of the statute, the court stated "[s]o limited, the statute then, in subsection (b), imposes four proscriptions . . . ." *Id.* Finally, support for this conclusion comes from the brief of the United States in support of RLUIPA's constitutionality. As an intervenor, the United States maintains that Sections (b)(1) and (b)(2) enforce the free exercise clause's protections against religious discrimination. (*See* United States's Brief at 11) ("In RLUIPA . . . §§ 2(b)(1) and (2), Congress merely created statutory mechanisms and remedies to protect existing First Amendment rights as interpreted by the federal courts."); (*see generally* United States's Brief at 17-20) (discussing Section (b)'s codification of *Lukumi*, a Supreme Court case involving the Free Exercise Clause.) Another factor weighing in favor of the conclusion that Section (b) is properly read as a subset of Section (a) is that Section (b) does not delineate the standard of review for courts to apply. Section (a), in contrast, mandates application of the compelling interest standard. If Section (b) were interpreted as a "strict liability" provision, then the section would potentially pose constitutional problems: free exercise and equal protection caselaw recognizes that in compelling circumstances, governments may burden religious exercise, or classify on the basis of religion. *Dukes*, 427 U.S. at 303-04. To bar all restrictions on religion would likely extend beyond constitutional mandates, and potentially render the statute unconstitutional. To avoid possible constitutional problems, this court therefore will construe Section (b) of the statute as a subset of Section (a). *I.N.S. v. St. Cyr*, 533 U.S. 289, 299-300 (2001) (courts are obligated to construe statutes to avoid constitutional problems when fairly possible).

Construing Section (b)'s "specific provisions" as falling under Section (a)'s prohibition of substantially burdening religious exercise, the court concludes that Vineyard's claims under these portions of the statute must fail as well. As discussed above, Vineyard has not demonstrated a substantial burden on religion. Therefore, the court concludes that Section (b) of the statute has not been violated. Because the court has determined that the Evanston ordinance does not violate

48

the relevant provisions of RLUIPA, the court need not address the City's contention that RLUIPA is unconstitutional.

## VI.    Illinois Religious Freedom Restoration Act

Vineyard has also alleged a violation of the Illinois Religious Freedom Restoration Act, 775 ILCS 35/15 ("IRFRA"). The court recognizes that it has discretion not to reach difficult issues of state law, but will exercise that discretion in this case because the matter is fully briefed and because the issues are closely related. Section 15 of the IRFRA provides:

> Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest.

Vineyard claims that the Evanston City Council substantially burdened Vineyard's religious exercise by rejecting the 1997 and 1999 petitions to amend the Ordinance and by failing to act upon and approve Vineyard's special use applications. As this is a new statute, there is very little Illinois caselaw to guide this court. Section 10 of the statute states that one of the purposes of the act is "[t]o restore the compelling interest test set forth in *Yoder*, 406 U.S. 205 (1972), and *Sherbert v. Verner*, 374 U.S. 398 (1963)." 775 ILCS 35/10 (West 2002). One of the few Illinois cases to apply the statute has also noted this intent. *City of Chicago Heights v. Living Word Outreach Full Gospel Church and Ministries, Inc.* 302 Ill.App.3d 564, 571, 707 N.E.2d 53, 59 (1st Dist. 1998), *rev'd on other grounds by City of Chicago Heights v. Living Word Outreach Full Gospel Church and Ministries, Inc.*, 196 Ill.2d 1, 749 N.E.2d 916 (Ill. 2001).

Vineyard must first demonstrate under this test that its exercise of religion has been substantially burdened. If it does so, Evanston is required to demonstrate that the City's interest is compelling and that the Ordinance is the least restrictive means of furthering that interest. 775 ILCS 35/15. Vineyard has shown that it has incurred significant expense by having to rent out a

space in which to hold worship services, and it has demonstrated logistical difficulties in not having worship services in a property owned and run by the church. As stated previously, the court sympathizes with Vineyard's plight, but does not believe that these inconveniences rise to the level of a substantial burden. Vineyard remains able to hold worship services, and the possibility remains that Vineyard might be able to find a suitable property and sell the building at 1800 Ridge. Having concluded that there is no substantial burden on Vineyard's exercise of religion, it is therefore unnecessary for the court to discuss whether Evanston has demonstrated a compelling interest and narrowly tailored means of meeting that interest.

## VII.    Compliance with Zoning Standards for Zoning Amendments and Special Use Permits

Finally, Vineyard argues that in denying its applications for amendment, Evanston acted arbitrarily and capriciously. Evanston's decisions were not rationally related to any legitimate government purpose, Vineyard maintains, and those decisions therefore violated the municipal zoning enabling statutes of Illinois (65 ILCS 5/11-13-1, et seq.) and Article I, Section 2.[19] (Complaint at ¶ 125.) The standard under which Vineyard's challenge must proceed is the rationality test set forth in the seminal case LaSalle National Bank of Chicago v. County of Cook, 12 Ill.2d 40, 145 N.E.2d 65 (1957). "A zoning ordinance is presumed valid, and a successful challenge requires proof, by clear and convincing evidence, that its enactment was arbitrary, capricious, or unrelated to the public health, safety, and morals." Rodriguez v. Henderson, 217 Ill.App.3d 1024, 1028, 578 N.E.2d 57, 60 (1st Dist. 1991) (citation omitted). Under the clear and convincing standard, "[w]here it appears, from all the facts, that room exists for a difference of opinion concerning the reasonableness of a [zoning] classification, the legislative judgment must be conclusive." American Nat. Bank and Trust Co. v. City of Chicago, 209 Ill.App.3d 96, 117, 568 N.E.2d 25, 38 (1st Dist. 1990) (citation omitted).

[19]    Vineyard does not allege a violation of the due process clause of the U.S. Constitution.

The Illinois Supreme Court has set forth several factors (the "*LaSalle* factors") to weigh in determining the validity of a zoning ordinance. The factors for courts to consider include: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the particular zoning restrictions; (3) the extent to which the ordinance promotes the health, safety, morals or general welfare of the public; (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purposes; (6) the length of time the property has been vacant as zoned, considered in the context of land development in the area in the vicinity of the subject property; (7) the community need for the proposed use; and (8) the care with which the community has undertaken to plan its land use development. *American Nat. Bank,* 209 Ill.App.3d at 116, 568 N.E.2d at 38 (citing *LaSalle Nat. Bank,* 12 Ill.2d at 46-47, 145 N.E.2d at 69, and *Sinclair Pipe Line Co. v. Village of Richton Park,* 19 Ill.2d 370, 378, 167 N.E.2d 406 (Ill. 1960)). The court will address each factor in turn.

### 1. Existing Uses and Zoning of Nearby Property

Vineyard argues under the first factor that because the O1 District is a mixed use district, which includes some residential buildings, the Ordinance is arbitrary because it bars religious institutions. Vineyard notes that religious institutions are permitted in other districts zoned for residential uses, and concludes that it does not make sense to exclude them from the O1 Districts. Evanston contends, however, that in the residential districts where churches are permitted as of right, those churches existed well before the current zoning law went into effect. Rather than force those churches into the status of "non-conforming uses," the City decided to permit them in those areas, while excluding churches from O1 Districts where no churches already existed, in the hope of creating more space for offices. (Tr. 1135-36.)

Furthermore, Evanston points out that the uses actually abutting the subject property are

the offices at 1740 and the two office buildings immediately to the north, including the most recently rehabbed offices adjacent to the subject property. (Tr. 1132-33.) As Evanston asserts, the fact that two other buildings have been converted for residential use is indicative of another economically viable use in the district which will contribute to the tax base and the economic welfare of the City. The court does not find Evanston's justifications overwhelming, but given the lenient standard of review to be applied, this factor weighs in the City's favor.

### 2. Extent to Which Property Values are Diminished by the Zoning Restrictions

There is no evidence that the property values in the O1 District have been diminished by the zoning restrictions. The property was purchased for $1,100,000, and was appraised by Evanston's expert, MaRous, at $1,850,000 for office purposes. The plaintiff has received an offer for its listed price of $2,500,000 if the property could be used for condominiums. (Tr. 287.) Thus this factor weighs in Evanston's favor.

### 3. Extent to Which the Ordinance Promotes the Health, Safety, Morals or General Welfare of the Public

The sanctuary Vineyard installed in the subject property would require parking in excess of 300 cars based upon Alroth's testimony and the analysis of the Institute of Traffic Engineers. (Tr. 1012.) Hamilton testified for Vineyard that 121 parking spaces are currently available. (Tr. 854.) Therefore Vineyard is short about 230 spaces for parking. (Tr. 889.) MaRous testified that the use of the building as a church would constitute a severe encroachment into the residential neighborhood to the west with the traffic and parking on Sundays and major holidays. (Tr. 1074.) Although the court agrees that these are valid concerns for city planners, the court is somewhat dissatisfied by Evanston's failure to distinguish this from the potential situation of a cultural organization, a permitted use in the O1 District, which presumably would create the very same problems. Furthermore, there is no evidence suggesting that Vineyard would be unable to meet Evanston code requirements for parking.

Evanston has also adduced other reasons for its zoning, however. Evanston witnesses testified that the Ordinance promotes the general welfare of the City by attracting businesses to the City with new office space. (Tr. 1201.) Employment opportunities were a factor in the drafting of the Ordinance. (Tr. 1199.) Evanston points out that it was not only concerned about the tax exemption of religious institutions (therefore explaining why cultural institutions are permitted, although they too may be tax exempt), but rather was concerned about the larger economic impact on the community. The focus was on creation of jobs, and Evanston felt that focusing on the development of office space would create the best possible economic environment for the City. (Tr. 1236.) Although this factor presents a close question, given that Evanston freely allows tax exempt cultural institutions to reside in the district, the court is persuaded that this factor weighs in Evanston's favor.

### 4. Relative Gain to the Public as Compared to the Hardship Imposed Upon the Individual Property Owner

As discussed in the section immediately preceding this one, Evanston has proffered important justifications for its zoning ordinance. Compared to the hardship imposed upon Vineyard, the court comes down in Evanston's favor. There is no question that Vineyard spent considerable time searching for suitable property to meet its needs. The church no doubt suffers financial hardship due to its need to rent space from Evanston Township High School in order to hold weekly worship services. Vineyard is undeniably burdened by its inability to perform all church functions under one roof. Still, Vineyard was fully aware of the land use restrictions at the time it purchased the property. And Vineyard remains able to conduct worship services, albeit in a less convenient location. When compared against the City's interest in promoting the economic viability of the City as a whole, the court concludes that Vineyard's interests must give way to the larger economic interests of the City.

### 5. Suitability of the Subject Property for the Zoned Purposes

It is undisputed that the building at 1800 Ridge is appropriate for its zoned purpose, for use as an office building. The fact that, as Vineyard points out, there are growing numbers of residential buildings in the O1 District does not automatically lead to the conclusion that religious institutions should be permitted as well. The fact remains that the City's stated goal was to expand and promote areas in the City for office use.

6.    **The Length of Time the Property Has Been Vacant as Zoned Considered in the Context of Land Development in the Area in the Vicinity of the Subject Property**

A lengthy vacancy suggests the zoning ordinance restrictions are too harsh. It is undisputed that the building was vacant for a period of years prior to its purchase by Vineyard. (Tr. 1256.) Evanston has proffered various justifications for the building's vacancy in the early 1990s, (Tr. 1220-26), and observes that while the building was in bankruptcy no offers were considered to purchase the property. (Tr. 536-37.) The fact that the building was idled by bankruptcy supports Vineyard's argument, however. The court concludes this factor favors Vineyard.

7.    **The Community Need for the Proposed Use**

The City put on ample evidence demonstrating the need for office space in Evanston. Evanston demonstrated that promoting greater office space in the City would help create jobs and stimulate economic activity. (Tr. 1236.) This factor weighs in favor of the City.

8.    **Care with which the Community has Undertaken to Plan its Land Use Development**

Evanston put on sufficient evidence under the *LaSalle* test showing that it has devoted diligent effort to planning its land use development. Gourguechon testified that he knows of no other municipality that so consistently revised and maintained a rational plan for its citizens. (Tr. 1158-59.) The process which resulted in the 1993 comprehensive amendment to the Evanston Zoning Ordinance took more than four years and involved input from a variety of experts. Even Lenet, an expert witness for Vineyard, testified that Evanston did a good job planning its districts.

(Tr. 569.) Although this is a general statement unrelated to the specific zoning ordinance, the court is comfortable in finding that this factor weighs in Evanston's favor.

Because the majority of the factors favor the City, the court concludes that Vineyard's claim that the Ordinance is arbitrary and capricious is without merit. The City has proffered several justifications for the zoning ordinance, and it is not the role of the court to second guess the decisions of experienced legislators. The court is uncertain why Evanston permitted cultural uses in the O1 Districts, given its concern for promoting economic growth, but the court does not believe this characteristic requires the conclusion that Evanston's land use development is arbitrary and capricious. Vineyard's challenge under the zoning enabling statutes of Illinois is dismissed.

## CONCLUSION

The court concludes that Vineyard's free speech and assembly rights (counts IV, V, VII, and VIII) have been violated, as well as its right to the equal protection of the laws (Counts II and IX). The court finds Evanston not liable under Vineyard's remaining claims: free exercise (Counts III and VI), RLUIPA (Count XII), IL RFRA (Count I), and compliance with Illinois zoning standards (Counts X and XI).

This decision addresses the merits of Vineyard's substantive claims, but does not address the issue of what relief is appropriate. Vineyard seeks declaratory and injunctive relief allowing it to use the subject property as a church and to hold worship services at the property. Vineyard also seeks compensatory damages for expenses incurred as a result of the Ordinance, including rent paid to Evanston Township High School, as well as the fees and expenses incurred defending Vineyard's property tax exemption against the City. Finally, Vineyard seeks an award of attorneys fees and costs pursuant to 42 U.S.C. § 1988, and any other relief the court deems just. Evanston, for its part, has not addressed the issue of damages in any detail. The court concludes on this record that any specific order of relief is premature. The court encourages counsel to meet and

confer regarding a possible agreed resolution of the relief issues. Should the parties be unable to reach a resolution on their own or with the assistance of the magistrate judge, the court will schedule further proceedings on these issues.

ENTER:

Dated: March 31, 2003

REBECCA R. PALLMEYER
United States District Judge